UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

G.B., as administrator of A.B.'s estate,

                           Plaintiff,

   -v-                              1:14-CV-0500
                                          (DNH/CFH)

PAULA DIPACE; CHRISTINE GORILL;
CATHY TURCK and CYNTHIA GRUPE,

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| EMERY CELLI BRINCHKERHOFF & ABADY, LLP<br>Attorneys for the Plaintiff<br>600 Fifth Avenue, 10th Floor<br>New York, New York 10020 | DIANE L. HOUK, ESQ.<br>ILANN M. MAAZEL, ESQ.<br>SAMUEL SHAPIRO, ESQ. |
| HON. LETITIA JAMES<br>Attorney General for the State of New York<br>Attorney for Defendants<br>The Capitol<br>Albany, New York 12224 | C. HARRIS DAGUE, ESQ.<br>KYLE W. STURGESS, ESQ.<br>Ass't Attorneys General |

DAVID N. HURD
United States District Judge

### MEMORANDUM-DECISION and ORDER

**I.     INTRODUCTION**.

Plaintiff G.B., as the guardian and administrator of the estate of her daughter A.B.[1], filed

this action on April 30, 2014. G.B. asserts that the defendants, Paula DiPace ("DiPace"),

Christine Gorrill ("Gorrill"), Cathy Turck ("Turck") and Cynthia Grupe ("Grupe"), employees of the

Office of People With Development Disabilities ("OPWDD"), an agency of the State of New York,

were deliberately indifferent toward A.B.'s health and safety by failing to protect her from a sexual

---

[1] A.B. passed away on June 5, 2016 in circumstances unrelated to this lawsuit.

assault, in violation of A.B.'s Fourteenth Amendment substantive due process rights and 42 U.S.C. § 1983. Further, plaintiff alleges that defendants permitted a sexually hostile living environment by failing to intervene to stop sexual harassment, in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") and New York State Human Rights Law, N.Y. Exec. Law. § 290 *et seq.* ("NYHRL"). Plaintiff seeks compensatory and punitive damages. See Amended Complaint, ECF No. 5.

Presently under consideration is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. See ECF No. 88. Plaintiff has submitted a response and defendants have replied. See ECF Nos. 94 & 95. Oral argument was held in Utica, New York.

## II.     **FACTUAL BACKGROUND**.

The following facts, taken from the amended complaint and the parties' statements pursuant to Northern District of New York Local Rule 7.1(3), are undisputed unless otherwise indicated. Consideration has been given to whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.

The parties dispute many of the relevant, material facts of this case.

In 2012, A.B. was a 27 year old woman who suffered from Goldenhar Syndrome and who had been diagnosed with a number of severe mental disabilities. From 2007 to 2012, A.B. resided at a OPWDD community residence in Brunswick, New York that provides room, board and services to persons with developmental disabilities (the "McChesney Facility"). At the relevant time, the McChesney Facility housed six individuals with developmental disabilities, four females and two males. The house contained four bedrooms on the second floor. A.B. roomed

with another female resident in one bedroom while the two male residents, including an individual

identified as R.V., occupied another bedroom on the second floor. The McChesney Facility was

staffed 24 hours per day by a variety of OPWDD employees, many of whom provided one-on-

one care to the residents.

Sometime in April 2012, A.B. informed staff at a day program that R.V. had entered her

room in the evening and urinated on her bed, and that she had physically assaulted him in

response. A.B.'s report was conveyed to Turck, the Treatment Team Leader for OPWDD's

team. In that position, Turck oversaw eight OPWDD residential facilities in the Capital District.

Turck states that she informed DiPace and Gorrill of A.B.'s allegation and instructed them to

check A.B.'s bed linens for signs of urine and to conduct a body check of R.V. to determine if he

was injured. DiPace served as a Developmental Assistant 2, known as the "house leader", of

the McChesney Facility, and Gorrill served as a Developmental Assistant 1, known as the

"assistant house leader" of the McChesney Facility. Defendants allege that DiPace and Gorrill

investigated A.B.'s allegation pursuant to Turck's directive and did not find any evidence to

substantiate the allegation. Turck contends that A.B.'s allegation did not constitute a reportable

incident requiring formal OPWDD investigation, a conclusion she came to after consulting with

OPWDD's leader for incident review and compliance. The parties agree that no additional

protections such as door locks, monitors, additional staffing or other precautions were put in

place as a result of A.B.'s allegation.

On the evening of April 26, 2017, it is alleged that R.V. went into A.B.'s room and raped

her. Grupe, a Developmental Support Aide ("DSA"), was the only employee working at the

McChesney Facility the evening of A.B.'s rape. Grupe was stationed on the first floor while all

residents were on the second floor of the facility.  Investigations by both the Rensselaer County Sheriff's Office and the OPWDD substantiated A.B.'s rape allegation.  While R.V. did not have a history of sexually aggressive behavior[2], he suffered from insomnia and was known to walk the second floor during the evening hours and had  documented incidents of entering the rooms of other residents during the night.

### III.    LEGAL STANDARD.

### (a) Summary Judgment Standard.

Summary judgment is appropriate where, construing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law".  FED. R. CIV. PRO. 56(c); Richardson v. Selky, 5 F.3d 616, 621 (2d Cir. 1993).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party opposing summary judgment "'may not rest upon the mere allegations or denials of [their] pleading, but . . .must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting First Nat'l Bank of Ariz. v. Cities Svcs.Co., 391 U.S. 253, 288 (1968)).  Those specific facts must be supported by "citing to particular parts of materials in the record."  FED. R. CIV.

---

[2]  Plaintiff submitted the Declaration of Jacqueline Turo, the sister of another McChesney resident identified as A.M., who alleged that a male resident repeatedly entered her room and jumped on her while residing at the McChesney Facility in 2004.  While R.V. lived at the facility at that time, A.M. was unable to identify R.V. as the perpetrator.  Therefore, the submission is insufficient to establish a prior sexual incident involving R.V.  Further, the incident predated the employment of all but defendant DiPace, so it is insufficient to establish knowledge that the McChesney Facility's safety features were insufficient or had previously failed.

PRO. 56(c)(1)(A). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

*(b) Substantive Due Process - Failure to Protect.*

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); see also Padilla v. Westchester Cnty., 2012 WL 690641, at *1 (S.D.N.Y. Mar. 2, 2012).

"Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y., 660 F.3d 612, 626 (2d Cir. 2011) (citing Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995)). In the Second Circuit, there are "two separate and distinct theories" under which a state actor's failure to protect against private violence can violate substantive due process—the "special relationship" theory and the "state-created danger" theory. See Benzman v. Whitman, 523 F.3d 119, 127 (2d Cir. 2008) (internal quotation marks omitted). If a plaintiff's claim satisfies one or both of these theories, the plaintiff must also show that the defendant's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" to sustain a substantive due process claim. Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1998)).

- 5 -

*(c) Fair Housing Act*.

The FHA provides that "it shall be unlawful ... to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of ... sex ..." 42 U.S.C. § 3604(b).  The FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section ... 3604[.]" 42 U.S.C. § 3617.

"Courts in this Circuit have construed § 3604(b) of the FHA to prohibit the creation of a 'hostile environment' by individuals who have control or authority over the 'terms, conditions, or privileges of sale or rental of a dwelling,' similar to the prohibition imposed by Title VII against the creation of a hostile work environment." Cain v. Rambert, 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014); see also Anonymous v. Goddard Riverside Cmty. Ctr., Inc., 1997 WL 475165, at *4 (S.D.N.Y. July 18, 1997).

*(d) New York Human Rights Law*.

The New York Human Rights Law likewises prohibit discrimination in the provision of housing accommodations or in the terms or conditions of such arrangement.  Section 296(5)(a)(2) of the New York State Human Rights Law provides, in relevant part, that it "shall be an unlawful discriminatory practice for the owner . . . or other person having the right to sell, rent or lease a housing accommodation . . . or any agent or employee thereof . . . to discriminate against any person because of . . . sex . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services

therewith." N.Y. EXEC. LAW § 296.  Courts in the Second Circuit have recognized a cause of

action pursuant to Section 296 where a hostile housing environment exists with regards to

allegations of sexual harassment.  See Cain, 2014 WL 2440596, at *4, n. 4.  The standards

relevant to a claim of discrimination under NYHRL "parallel those applicable under the FHA."

Lynn v. Village of Pomona, 212 F. App'x 38, 40 n. 2 (2d Cir. 2007).

## IV.    DISCUSSION.

### (a) Substantive Due Process Claim.

Developmentally disabled individuals "in the custody of state officials have constitutionally

protected rights to adequate food, shelter, clothing and medical care, to safe living conditions,

and to freedom from undue bodily restraint." P.C. v. McLaughlin, 913 F.2d 1033, 1042 (2d Cir.

1990) (internal citations omitted).  Courts in the Second Circuit have acknowledged that it is

unclear whether a failure to protect claim set forth by a civilly-committed individual should be

analyzed under a "substantial departure standard", a general substantive due process analysis

or under the standard of deliberate indifference.  See Brooks v. Brennan, 2014 WL 6975370, at

*9 (N.D.N.Y. Dec. 9, 2014) (S.J. Mordue).  The substantial departure standard requires the

plaintiff to demonstrate that an official's decision was a "substantial departure from accepted

professional judgment, practice or standards."  Vallen v. Carrol, 2005 WL 2296620, at *8

(S.D.N.Y. Sept. 20, 2005).  A general substantive due process analysis would ask the plaintiff

to show that the defendant "intended to injure [plaintiff] in some way unjustified by [any] . . .

governmental interest and most likely rise to the conscience-shocking level."  Id. Finally, a

deliberate indifference analysis requires the plaintiff to demonstrate that the state actor acted with "deliberate indifference" in failing to protect the individual from harm. See Farmer v. Brennan, 511 U.S. 825, 834 (1970).

In the Northern District, courts have found that the deliberate indifference standard is appropriate where the plaintiff is an involuntarily committed individual alleging failure to protect in violation of their substantive due process rights after an assault by another patient. See McChesney v. Hogan, 2010 WL 3613806, at *5 (N.D.N.Y. Aug. 11, 2010) (M.J. Peebles). The Southern District has found that the professional judgment standard was appropriate when considering "higher-level decisions like patient placement and the adequacy of supervision" and the deliberate indifference standard where the defendants were "low-level staff members" who were addressing day-to-day issues, rather than "higher-level decisions". Vallen, 2005 WL 2296620, at *8.

Based on the existing case law, the professional judgment standard will be applied to defendant Turck and the deliberate indifference standard will be applied to defendants DiPace, Gorrill and Grupe.

"To establish a defendant's 'deliberate indifference' to a violation of law, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind." D.K. by L.K. v. Teams, 260 F. Supp. 3d 334, 354 (S.D.N.Y. 2017). "[F]or 1983 claims arising out of violations of the Fourteenth Amendment, the defendant state official must have acted with objective recklessness with respect to the violation." Id. (citing Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017)). "The plaintiff must show only that 'the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though the defendant-official knew, or should have known, that the

condition posed an excessive risk to health or safety.'" Id. at 354-55 (quoting Darnell, 849 F.3d at 35).

Plaintiff argues that the defendants failed to take any action to protect A.B. from sexual assault after A.B. reported that R.V. entered her room uninvited and urinated on her bed. Plaintiff alleges that defendants failed to: (i) place a door alarm on A.B.'s bedroom door, (ii) place an audio monitor in A.B.'s bedroom, (iii) increase the number of night staff at the facility, (iv) increase the frequency of bed checks, (v) move A.B. or R.V. to a room on the first floor, (vi) direct any staff to write A.B.'s allegation down and undertake a formal investigation or (v) inform A.B.'s parents of the allegation.  See Pl.'s Memo., ECF No. 94.

(i) *Personal Involvement.*

In their motion, defendants argue that Grupe, Gorrill and DiPace lacked the authority necessary to institute any safety measures and are therefore not personally involved.[3]  They assert that the changes plaintiff suggests should have been implemented after A.B.'s urination allegation against R.V. would have required an act of an interdisciplinary treatment team, A.B.'s psychologist and/or an independent OPWDD human rights committee and that none of these defendants could have taken such preventative action on their own initiative.  Where a subordinate employee lacks the "authority to prevent the alleged constitutional violations caused by their supervisor . . . a claim of deliberate indifference fails as a matter of law."  Kregler v. City of New York, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011).

---

[3] Defendants seemingly concede that Turck had authority to make at least some of the cited changes and therefore was personally involved.

*(A) Defendants Gorrill and DiPace.*

Defendants concede that both Gorrill and DiPace were aware of A.B.'s allegation that R.V. had entered her room and urinated on her bed sometime in April 2012. Further, as individuals overseeing the daily operation of the McChesney facility, they had a certain amount of authority and control over the direction of activities there.

Plaintiff points out that prior to 2012, OPWDD staff had implemented protective measures in response to allegations of A.B.'s sexual activity. In 2007, after A.B. had alleged she had sexual intercourse with a peer at her OPWDD residence, "[o]vernight staffing was increased from one staff to two staff," and a door alarm was put on her bedroom door. See Pl.'s Rule 7.1 Stat., Ex. Y, ECF No. 94-33, at 2. Plaintiff asserts that from September 2010 until at least November 2011, A.B. had an audio monitor in her bedroom and a door alarm "to detect if any possible abuse may be occurring in the room." See id., Ex. G, ECF No. 94-15, at 3. As both DiPace and Gorrill were working at the McChesney facility at this time, they likely would have been familiar with these precautionary measures and the reasons for their utilization. However, the audio monitor and door alarm were removed sometime prior to April 2012 without explanation. See id., Ex. H, ECF No. 95-16, at 17.

Additionally, after A.B.'s return to the McChesney Facility in May 2012, numerous protective measures were taken, seemingly without the approval of the OPWDD Human Rights Committee. Turck testified that, generally, it was possible to install motion detectors or door alarms on a temporary basis prior to obtaining approval from the Rights Committee for certain protection reasons. See Pl.'s Rule 7.1 Stat., Ex. H, ECF No. 94-16, at 24. A door alarm was placed on A.B.'s bedroom door, motion sensors were installed throughout the facility and the frequency of bed checks was increased. See id., Ex. K, ECF No. 94-19 at 25; Ex. E, ECF No.

94-13, at 165-167.  R.V. was found outside of A.B.'s bedroom on three occasions as a result of the door alarm on A.B.'s door.  See id., Ex. UU, ECF No. 94-55.

Further, both DiPace and Gorrill were members of A.B.'s Treatment Team.  During the period between A.B.'s urination allegation against R.V. and the rape on April 27, 2012, neither DiPace nor Gorrill requested that a meeting be held to discuss or address A.B.'s allegation or begin the process of implementing safety measures if outside approval was in did necessary.

Upon review of the materials supplied by the parties, the deliberate indifference standard should apply to DiPace and Gorrill given their positions.  A fact finder should decide whether either DiPace or Gorrill possessed sufficient authority as developmental assistants or as members of A.B.'s treatment team, to initiate or put in place safeguards to protect A.B. from harm.  It will then be for such fact finder to determine whether DiPace or Gorrill knew, or should have known, that there was an excessive risk of harm to the health or safety of A.B. and whether their actions constituted a reckless failure to act with reasonable care in order to mitigate that risk.  As a result, defendants' motion for summary judgment with regards to the personal involvement of DiPace and Gorill will be denied.

*(B) Defendant Grupe.*

It is not alleged that Grupe was aware A.B.'s urination allegation against R.V. prior to the rape on the evening of April 26, 2012.  However, she was on duty the night of the incident. Grupe testified that she would generally spend her time on the first floor and would go upstairs if she heard movement on the second floor.  See Pl.'s Rule 7.1 Stat., Ex. J, ECF No. 94-18 at

12. She further testified that she would watch television or read while on duty. Id. at 14. She noted that A.B. got up at approximately 1:30 a.m. during the night complaining of chest pains and was redirected back to bed. Id. at 17. At a point prior to the incident, she had also been reassigned away from the overnight shift because, in her own words, she "cannot stay awake and fear getting in trouble for sleeping." See id., Ex. W, ECF No. 94-31 at 2.

As the only employee on duty at the McChensey Facility during the night shift, it was imperative that Grupe be alert to any movement among the residents on the second floor. Grupe was aware that there were both male and female residents there and that were no locks on the residents' doors. With the admission that she was prone to fall asleep on the overnight shift, her decision to choose to work such shift could be considered by a reasonable fact finder to be deliberately indifference to the health and safety of the residents at the McChensey Facility. Therefore, Grupe is not entitled to summary judgment as a result of a lack of personal involvement and the motion will be denied in this regard.

### (ii) *Qualified Immunity*.

Next, defendants assert that they are entitled to qualified immunity given A.B.'s alleged history of making false allegations and R.V.'s lack of prior sexual incidents. See Dfs' Memo., ECF No. 88-2 at 16-19. Defendants allege that A.B. had a significant history of making unsubstantiated and far-fetched claims of physical and sexual abuse, including approximately ten allegations of sexual abuse and seven allegations of physical abuse that were investigated by OPWDD from 2006 to 2012. See Declaration of Cathy Turck, Ex. 5, ECF No. 88-6. Defendants also assert that they did take reasonable steps to investigate A.B.'s claims, and that therefore, their conduct was objectively reasonable.

"Qualified immunity shields government officials from civil suits for damages 'insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not only a defense, it is "an entitlement not to stand trial" or "face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

"Defendants are entitled to qualified immunity 'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001)). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" Id. (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir.1998)). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." McCullough v. Wyandanch Union Free Sch., 187 F.3d 272, 278 (2d Cir.1999).

The Supreme Court has long held that the "right to personal security constitutes a history liberty interest protected substantively by the Due Process Clause." Youngberg v. Romeo, 457 U.S. 307, 315 (1982). The Second Circuit has further clearly established that a developmentally disabled individual in the custody of state officials have "constitutionally protected rights to

adequate food, shelter, clothing and medical car, to safe living conditions and to freedom from undue body restraint." P.C. v. McLaughlin, 913 F.2d 1033, 1043 (2d Cir. 1990) (internal citations omitted). Therefore, the deliberate failure by a state official to protect a developmentally disabled from harm with regards to living conditions would violate clearly established law.

The second prong requires a determination of whether "it was objectively reasonable for [defendants] to believe their acts did not violate" A.B.'s right to safe living conditions. Southerland v. City of New York, 680 F.3d 127, 141 (2d Cir. 2012).

A reasonable fact finder could conclude that the defendant's conduct was not objectively reasonable. Turck, DiPace and Gorrill were aware of A.B.'s allegation that R.V. entered her room in the evening of April 26, 2012 and urinated of her bed. Such act would be a vulgar invasion of A.B.'s living space and an affront to her safety. A fact finder could conclude that Turck's decision not to classify the allegation as a reportable incident triggering a formal investigation, regardless whether other persons were consulted, was objectively unreasonable. Further, a reasonable fact finder could find that the dismissal of A.B.'s allegation by Turck, DiPace and Gorrill after an alleged informal investigation and their failure to enact any safety precautions in the McChensey facility was objectively unreasonable. Lastly, a fact finder could conclude that the actions of Grupe, as the only night staff on duty, were objectively unreasonable. Therefore, none of the defendants entitled to qualified immunity and their motion for summary judgment in this regard will be denied.

### (iii) Deliberate Indifference.

Defendants further argue that they are entitled to summary judgment as they allege that Turck, DiPace and Gorrill took concerted steps to investigate A.B.'s urination allegations against R.V. and therefore did not act with deliberate indifference.

Defendants claim that Turck informally instructed DiPace and Gorrill to inspect A.B.'s bed linens for signs of urine and to inpsect R.V. for any signs of injury and found no evidence substantiating A.B.'s allegation against R.V.  Defendants assert that while plaintiff may disagree with the investigation that occurred or its finding, the fact that some investigation was conducted demonstrates that they were not deliberately indifferent.

However, plaintiff argues that the claim that an informal investigation was conducted is not credible in light of the lack of records concerning the alleged actions taken by defendants. Plaintiff points to the fact that a body check form of R.V. was not completed and no contemporaneous records were prepared reflecting this investigation.  Plaintiff persuasively argues that much, if not most, of the actions taken by staff at the McChensey Facility are documented in some way, from the "daily communication reports" evidencing every positive alarm report during the evenings, to the "general note" ledger documenting resident behavior. See Pl.'s Rule 7.1 St., Ex. OO, ECF No. 94-49; Ex. UU, ECF No. 94-55.

At the summary judgment stage, the credibility of Turck, DiPace and Gorrill cannot be determined.  Further, a reasonable jury may concluded that, regardless of whether an informal investigation was performed as claimed by defendants,  the failure to the defendants to conduct a formal investigation or to implement any safety measures as a result of A.B.'s allegation constituted deliberate indifference.  Therefore, defendants' motion concerning a lack of deliberate indifference will be denied.

*(b) Fair Housing Act Claim.*

The FHA prohibits a broad range of discriminatory housing practices based on a variety of protected characteristics, including sex. See 42 U.S.C. §§ 3604(a), (b). In addition to suit against private entities, the FHA has been interpreted to prohibit "governmental agencies from implementing or enforcing housing policies in a discriminatory manner ...." Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003). "Courts in [the Second] Circuit have construed § 3604(b) of the FHA to prohibit the creation of a 'hostile environment' by individuals who have control or authority over the 'terms, conditions, or privileges of sale or rental of a dwelling', similar to the prohibition imposed by Title VII against the creation of a hostile work environment.'" Cain v. Rambert, 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014).

Defendants argue that the FHA does not confer liability on state employees for the alleged conduct of one group home tenant against another tenant and even if it were to hold that it does, defendants should be entitled to qualified immunity as there is a lack of pre-existing law in the Second Circuit to establish such a federal right.

The Second Circuit recently decided Francis v. Kings Park Manor, Inc., 917 F.3d 109 (2d Cir. 2019), which provides guidance concerning the scope of the FHA. In Francis, the Second Circuit confirmed that 42 U.S.C. § 3604(b) applies to post-acquisition housing claims, i.e. that the FHA prohibits discriminatory conduct which affects the conditions and privileges of the housing accommodation after the tenant takes possession. See id. at 113. Further, the Court found that a plaintiff may establish a landlord's liability "for third-party harassment: '(1) [t]he third-party created a hostile environment for the plaintiff . . .; (2) the housing provider knew or should have known about the conduct creating the hostile environment;' and (3) notwithstanding its obligation under the FHA to do so, "the housing provider failed to take prompt action to correct

and end the harassment while having the power to do so.'" Id. (quoting 81 Fed. Reg. at 63,069 (codified at 24 C.F.R. pt. 100)).  Lastly, the Court held that a plaintiff is not required to allege that the defendant landlord's conduct with regards to the third-party's actions was the result of direct, intentional discrimination on its own part, rather than that of the third party.  Id.

However, review of case law that existed prior to Francis fails to evidence any cases recognizing a hostile housing environment claim against a landlord under the FHA based on knowledge of tenant-on-tenant harassment and the landlord's failure to intervene, a fact noted by the dissent in Francis.  See id. at 125 ("I can find no case from any circuit or district court cognizing the claim recognized by the majority today; only a handful consider it in the following two decades.  Even 'sparse,' it appears, is an understatement.").  Further, the Francis case is not directly analogous to plaintiff's case. While Francis alleged repeated racial harassment from a neighbor which was reported to a property owner and its management, plaintiff alleges that A.B. reported a single incident concerning R.V. to employees of a state agency.

At the time of the incident in April 2012, such cause of action under the FHA was not a "clearly established" statutory right of which reasonable people would have known for purposes of qualified immunity.  While plaintiff argues that qualified immunity is not applicable under the FHA, numerous courts have found that municipal defendants and state actors may be afforded qualified immunity under the FHA. See Gonzalez v. Lee County Housing Auth., 161 F.3d 1290, 1295 (11th Cir. 1998); Baggett v. Baird, 1997 WL 151544, at *21 (N.D. Ga. 1997); Samaritan Inns., Inc. v. District of Columbia, 114 F.3d 1227, 1238-39 (D.C. Cir. 1997); Meadowbriar Home

for Children v. Gunn, 81 F.3d 521, 532 (5th Cir. 1996).  Defendants are entitled to qualified immunity with regards to plaintiff's FHA claim.  As a result, summary judgment will be granted in favor of the defendants with regards to the second cause of action.

(c) *New York Human Rights Claim*.

Claims of housing discrimination under the NYHRL are analyzed under the same framework as the FHA.  See Mitchell v. Shane, 350 F.3d 39, 47 n.4 (2d Cir. 2003).  As defendants are entitled to qualified immunity for the plaintiff's FHA claim, they are also entitled to qualified immunity regarding plaintiff's NYHRL claim.  As a result, summary judgment will be granted in favor of the defendants with regards to the third cause of action.

## V.    CONCLUSION.

Plaintiff has presented sufficient evidence concerning her failure to protect claim to warrant a trial concerning all defendants.  However, defendants have demonstrated an entitlement to summary judgment with regards to plaintiff's Fair Housing Act claim and the claim under New York Human Rights Law.

Therefore, it is ORDERED that:

(1) Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**;

(2) Plaintiff's second and third causes of action are **DISMISSED**;

(3) Plaintiff's first cause of action against all defendants **REMAINS FOR TRIAL**; and

(4) A jury trial is scheduled for May 6, 2019 in Utica, New York and pretrial submissions must be filed on or before 5:00 p.m. on April 26, 2019.

IT IS SO ORDERED.

Dated: March 27, 2019
        Utica, New York 13501                    _____
                                                  United States District Judge

- 18 -